IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTHONY SIDES,                              )
                                            )
                  Plaintiff,                )
                                            )
     vs.                                    )       Civil Action No. 20-1168
                                            )
JOHN WETZEL, et al.,                        )       Magistrate Judge Dodge
                                            )
                  Defendants.               )

## MEMORANDUM OPINION

Plaintiff Anthony Sides ("Sides") is a prisoner in the custody of the Pennsylvania Department of Corrections ("DOC") who is currently incarcerated at the State Correctional Institution at Phoenix. He brings this pro se civil rights action under 42 U.S.C. § 1983, relating to claims arising while he was incarcerated at the State Correctional Institution at Pine Grove, Pennsylvania ("SCI Pine Grove") between April 2018 and February 2021.

Sides raises a claim under the Eighth Amendment to the United States Constitution based on deliberate indifference to his serious mental health needs. In addition, he asserts a Fourteenth Amendment due process claim for violation of his right to privacy when information about his mental health and treatment was allegedly revealed to other inmates and staff, and a claim under the Pennsylvania Mental Health Procedures Act, 50 P.S. §§ 7101-18 ("MHPA"). These claims are asserted against five correctional defendants at SCI Pine Grove, including Superintendent Lee Estock, D.L. Yingling, S.L. Newman, Chief Health Care Administrator ("CHCA") S.L. Bergey and Psychological Services Specialist Zachary Kennedy (together, "the DOC Defendants").

Pending before the Court is a motion for summary judgment filed by the DOC

Defendants (ECF No. 132).[1] For the reasons that follow, the DOC Defendants' motion will be granted with respect to Defendants Estock, Bergey, Newman and Yingling and granted in part and denied in part with respect to Defendant Kennedy.

## I.   **Procedural History**

Sides initiated this action in August 2020 with the filing of a motion for leave to proceed in forma pauperis, which the Court granted, and his Complaint was then docketed (ECF No. 11). He subsequently filed an Amended Complaint (ECF No. 43).

The DOC Defendants and Defendant Melczak both filed motions to dismiss (ECF Nos. 64, 68). On November 2, 2021, the undersigned filed a Report and Recommendation ("R&R") recommending that the motions be granted in part and denied in part (ECF No. 92). On April 12, 2022, Judge Ranjan adopted the R&R as the opinion of the Court (ECF No. 96). Some of Sides's claims were dismissed without prejudice to file a Second Amended Complaint. (*Id.* at 2-3.) However, Sides did not file a Second Amended Complaint, and thus the Amended Complaint is the operative pleading in this case.[2]

As all remaining parties have consented to the jurisdiction of the undersigned (ECF Nos. 2, 138), full jurisdiction is authorized pursuant to 28 U.S.C. § 636(c)(1) for the undersigned to decide dispositive motions and eventually enter final judgment.

---

[1] Sides also asserted an Eighth Amendment claim against Dr. Michael Melczak, a Licensed Psychology Manager who treated Sides while when both were at SCI Pine Grove. Dr. Melczak also moved for summary judgment, but Plaintiff subsequently voluntarily dismissed him from this action while the motion was pending (ECF Nos. 173, 174).

[2] The Amended Complaint also named as defendants then-DOC Secretary John Wetzel, Unit Manager Sawtelle, Inmate Counselor Cogan, John/Jane Doe Psychiatrist, John/Jane Does 1, 2 and 3, the Multi-Disciplinary Team and the Program Review Committee. These defendants were terminated from this action after Sides elected not to file a Second Amended Complaint or to identify the John/Jane Doe defendants (ECF Nos. 144, 146). Sides's claims under Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act were also dismissed by Judge Ranjan. (ECF No. 96.)

The motion for summary judgment filed by the DOC Defendants (ECF No. 132) has been fully briefed (ECF Nos. 133, 156, 164) and is ripe for disposition.

**II.   Relevant Factual Background**

A.   Sides's Mental Health History and Initial Treatment at SCI Pine Grove

Sides states that he has been treated for both Axis 1 and Axis 2 mental illnesses (including bipolar affective disorder/mixed type and antisocial personality disorder) and has been on psychotropic medications since he was a child and throughout his incarceration. He claims to have been hospitalized on numerous occasions for attempting suicide and engaging in Self-Injurious Behavior ("SIB"). Throughout his incarceration, he has consistently been on the DOC "active" mental health roster as either a Stability Code "C" or "D" and housed in special units such as the Special Needs Unit ("SNU") and the Mental Health Unit ("MHU") (Am. Compl. Exs. A, F; Sides Br. Ex. I; Sides Aff. ¶ 2) (ECF Nos. 43, 156, 159, respectively.)

Sides arrived at SCI Pine Grove on April 5, 2018 and was placed in the Restricted Housing Unit ("RHU") on administrative custody. SCI Pine Grove does not have a special mental health unit. (Sides Br. Ex. G, Answer Interrog. No. 8) (ECF No. 156-7.) Upon his arrival, Sides was interviewed out of cell and indicated that he was not feeling down, depressed, hopeless, or suicidal. His evaluation concluded with a plan for routine follow-up to psychology. (DOC Defs.' Concise Statement of Undisputed Material Facts ("DOCCSUMF") ¶¶ 1-4) (ECF No. 135.)

The DOC Defendants state that out-of-cell visits are offered to both RHU and general population inmates and were offered to Sides when he was in the RHU and in general population. When inmates refuse an out of cell encounter, it is common for staff to report to the cell and do a general wellness check which includes verifying the inmate's refusal and conducting a quick

assessment of his living conditions and general cognitive and mental well-being. (DOCCSUMF ¶ 9.)

Sides's first contact with Kennedy, who is a Psychological Services Specialist, was on April 9, 2018, four days after he was transferred to SCI Pine Grove. The interaction was uneventful, with no noted concerns, and a plan was put in place for continued regular contacts. According to Defendants, Sides was offered but chose not to meet with Kennedy out of cell. (DOCCSUMF ¶¶ 6-8.) Sides claims that Kennedy never offered him the option to meet outside the cell on this or any other occasion. (Plaintiff's Response to DOC Defendants' Concise Statement of Facts ("PRDOCDCSF") ¶¶ 7, 9 (ECF No. 169); Sides Aff. ¶¶ 25-31.) According to Sides, the RHU has specially modified cages made of metal and plexiglass to conduct medical and mental health evaluations, but Kennedy would not use them. (Sides Aff. ¶ 29.)[3]

The DOC Defendants contend that Sides also declined an invitation to meet with the Psychiatric Review Team (PRT), which meets weekly and includes Kennedy as a member. (DOCCSUMF ¶¶ 10-12.) Sides contends that he was offered and accepted only one opportunity to meet with the PRT during his entire time at SCI Pine Grove. (PRDOCDCSF ¶¶ 10-12; Sides Aff. ¶ 12.)

According to Defendants, during the remainder of 2018 and through April 2019, Sides had regular visits with Kennedy, mostly while Sides was in his cell because he refused to come out. His medication dose of Duloxetine (Cymbalta) was increased, but often he was not compliant with taking it, even though he had been encouraged to do so in order to achieve therapeutic benefits. Defendants assert that Sides denied any current suicidal ideation, plan or

---

[3] While not directly relevant to Sides's claims, he asserts that in the general population area, Kennedy would conduct cell-side visits or conduct psych visits in the middle of a day room with 60-100 other inmates present, allegedly for no justifiable reason. (*Id.* ¶ 30.)

intent and declined any additional resources. (DOCCSUMF ¶¶ 14-43.)

Sides denies that he was offered the opportunity to meet out of cell and claims that he refused to take Duloxetine because of its side effects. He expressed a desire to be switched to another medication, which he claims he had used successfully prior to being in prison, but "Defendants" denied his request. (DOCCSUMF ¶ 41; PRDOCDCSF ¶ 41.)

Sides claims that SCI Pine Grove did not have "mental health programming." (PRDOCDCSF ¶¶ 14-43; Sides Aff. ¶ 3.) For some period of time, he asserts, SCI Pine Grove lacked an on-site psychiatrist and "Estock, Bergey, Melczak and their agents had to call other prisons to get psychiatric orders over the phone." (Sides Aff. ¶ 14.) He also states that "Estock, Bergey, Melczak, Kennedy, Newman and Yingling all knew of his mental health crisis, suicide attempts, suicidal ideation, SIB behavior and being a 'high risk' of self-harm" and that they "had the authority to rectify the denial, delay and inadequacy of mental health treatment and programming yet chose not to help me." (*Id.* ¶¶ 15, 16.)

Sides claims that the DOC Defendants admitted to him that "SCI Pine Grove is not designed to house mental health prisoners and that there isn't any funding to initiate any programs or units for mental health prisoners." (Sides Aff. ¶¶ 17.) According to Sides, both a psychiatrist from another prison who evaluated him and the psychology department at SCI Pine Grove agreed that his mental health stability code should be increased to a "D" Code so that he could be transferred to another correctional facility that could treat his mental health illnesses with appropriate programming. (*Id.* ¶ 18.) The PRT discussed the possibility that a referral be placed for him to be sent to a MHU or other mental health program, but "again nothing happen[ed]." (*Id.* ¶ 19.)

Sides also represents that he spoke to each of the Defendants about these issues but

"Defendants began to justify their actions by down playing my mental health illnesses, my alleged refusals and white washing their lack of mental health services and programming especially when they found out about the lawsuit." (Sides Aff. ¶¶ 21-22.) He also states that he "was continuously placed on medications that caused side effects or didn't work and/or my confidentiality and privacy was at issue, which defendants constituted as a 'refusal.' When on medications that did work my compliance was 90-100%." (*Id.* ¶ 23.) He describes the mental health services at SCI Pine Grove as consisting solely of: "1. Telemedicine to prescribe psychotropic medications, 2. Puzzle books and information handouts, 3. Cursory cell-side visits . . . and placing inmates in Solitary Confinement who are on the 'active' mental health roster." (*Id.* ¶ 24.)

      B.  <u>May 9, 2019 Incident and Aftermath</u>

On May 9, 2019, while being transferred to the RHU due to a misconduct, Sides reported suicidal ideations. A Suicide Risk Indicators Checklist was completed for Sides because he verbalized a desire to injure himself. Sides also states that being placed in the RHU arbitrarily was causing him to feel suicidal or feel like committing SIB. (DOCCSMUF ¶ 44; Sides Aff. ¶ 7.)

As a result of his statements, Sides was placed in a Psychiatric Observation Cell ("POC") the same day and was seen by Kennedy. During this interaction, Sides was frustrated, less cooperative than during prior interactions, and reported feeling depressed. The POC orders initially directed that Sides would be placed on "Close Watch," meaning that an officer would observe him in the cell every ten minutes, and he was allowed to have a mattress, psych blanket, anti-suicide smock and reading materials with no staples. These orders were amended on May 10, 2019, to place him on "Constant Watch," meaning an officer was always observing him. According to Sides, although he was on "Constant Watch," he managed to shred his mattress

and make a noose which he used to try to hang himself. He also used a broken light to cut his arm, swallowed glass (requiring a trip to the emergency room) and cut himself with a razor he was given. (Sides Aff. ¶ 11.) After Sides damaged his cell, he was placed in a holding cell where he was seen by Kennedy. During this interaction, Sides did not provide any meaningful responses to Kennedy's questions. (DOCCSUMF ¶¶ 45-50; Sides Aff. ¶¶ 8-9.)

On May 10, 2019, Sides was evaluated by a psychiatrist during a telemed visit, during which he was less than cooperative. The psychiatrist noted that Sides may be using the POC as a way to avoid the RHU, and while the doctor discharged him from the POC, the doctor recommended that he remain in the POC through that weekend. Sides was made aware of the doctor's contact information and was made aware of how to access services. He was seen by a member of the psychology team later that day. (DOCCSUMF ¶¶ 51-54.)

Defendants state that Kennedy saw Sides on May 13, 2019, and offered to meet out of cell, but Sides declined. That same day, Sides was evaluated by a member of the psychiatry team, and after indicating that he would be compliant with his medication, a prescription for an antidepressant was submitted. A member of the psychiatry team attempted to see Sides for a follow-up visit on May 14, 2019; however, he refused to come out of his cell to be seen. That same day, Kennedy met with Sides cell side, after he declined to have an out of cell visit, during which Sides expressed negative thoughts. (DOCCSUMF ¶¶ 55-58.)

Sides denies declining to meet outside of the cell and states that because he was seen on May 10 via telemed, there was no way for him to contact this psych provider. (PRDOCDCSF ¶¶ 53, 57-58.)

Kennedy again saw Sides on May 15, 2019 and May 16, 2019. The DOC Defendants state that, on both occasions, Sides again declined to be seen out of cell; he denies this.

(DOCCSUMF ¶ 59; PRDOCDCSF ¶ 59.) On May 16, 2019, Sides was also evaluated by a member of the psychiatry team, and again refused to participate in an out of cell visit. The DOC Defendants state that he declined to leave his cell; Sides denies this statement. (DOCCSUMF ¶ 60; PRDOCDCSF ¶ 60.)

On May 17, 2019, Sides had a visit with a member of the psychology team as well as from Dr. Melczak. His Duloxetine was increased. On May 19, 2019, he was assessed by psychology and determined to be "stable," denying suicidal thoughts or intentions "for now." On May 20, 2019, he was again seen by a member of the psychology team as well as psychiatry. It was determined that he would be discharged from the POC and a plan was formulated to continue with his mental health care. (DOCCSUMF ¶¶ 61-62; Mental Health Records (ECF No. 134-1) at 149.)

Sides claims that he was supposed to be seen by both the PRT and the Program Review Committee ("PRC") on a weekly basis while in the POC, but this did not happen. (Sides Aff. ¶ 12.) Upon his transfer out of the POC, Sides was seen by a psychologist on May 22, 2019, and by Kennedy on May 23, 2019 and May 24, 2019. He was apprised of the changes to his treatment plan, including his removal from the close watch, and he appeared agreeable to this change. (DOCCSUMF ¶ 63.)

C.  Events Between May 2019 and July 2020

After his release from the POC, Sides was seen by a psychologist and Kennedy to discuss, among other things, a grievance he submitted, and his desire to be transferred out of SCI Pine Grove. Sides offered to withdraw his grievance if he was transferred. (DOCCSUMF ¶¶ 63-64.)

On June 3, 2019, Sides was again evaluated by a member of the psychiatry department, and his ongoing care was discussed (*id.* ¶ 65), including the possibility of transferring him to the

"D" mental health roster. His Duloxetine was increased and psychiatry noted that "Sides should undergo an Initial Psychiatric Evaluation (IPE) regarding a possible Mental Health Roster adjustment." (DOCCSUMF ¶¶ 63-65; ECF No. 134-1 at 173-76.)

Sides was seen by a psychiatrist again on June 10, 2019, and his treatment was discussed, including his request to be switched to a different medication, but "he could not give the right reason for wanting the drug, stating that he did not want to try any other antidepressant." (DOCCSUMF ¶¶ 66-67; ECF No. 134-1 at 178.)

On June 17, 2019, Sides participated in a PRT meeting, and discussed his ongoing mental health care, while making requests to be transferred to a different facility where the same unit team could address his multiple issues. (DOCCSUMF ¶ 68.)

Sides continued to be seen by Kennedy. The DOC Defendants state that Sides frequently refused to come out of his cell for these visits, but Sides denies that Kennedy offered him this option. Sides discussed his desire to be transferred out of SCI Pine Grove, and indicated that if this occurred, he would drop the pending grievance he had filed. (DOCCSUMF ¶¶ 69-93; PRDOCCDSMF ¶¶ 69-93.)

On February 11, 2020, "Sides underwent a full mental status exam by Psychiatry and it was noted that he was complaining of anhedonia, lack of motivation, irritability and anger towards his wife; Sides, however, denied suicidal ideation or any desire to die." After a referral to a psychiatrist, he denied wanting to hurt his wife. His Duloxetine was increased; "psychological intervention/therapy was also recommended, but the potential for changes was determined to be 'questionable.'" This pattern continued through July 8, 2020. On that date, "Psychiatry determined that the combination of [Duloxetine] and Pamelor may not be safe, recommended discontinuing Pamelor as it was duplicative of [Duloxetine], and offered Sides

Abilify for better control of potential acting [out] behavior; Sides was not willing to accept any changes." (DOCCSUMF ¶¶ 69-93; PRDOCDCSF ¶¶ 63-93; ECF No. 134-1 at 256, 291.)

        D.   <u>August 5, 2020 Incident</u>

On August 5, 2020, Sides was involved in an altercation with another inmate, resulting in his placement in the RHU. A Suicide Risk Indicators Checklist was completed and based on his responses to questions relative to suicidal thoughts, and a change in his family situation, he was moved to a POC, where he was on Close Watch. On August 6, 2020, he refused to participate in a telepsych visit with a psychiatrist and he refused the next day to be seen by two different members of the psychology team. After Sides verbalized suicidal ideation by hanging and having observed him with a frayed cord tied tightly around his neck, psychiatry changed the POC orders and placed him on Constant Watch. On August 9, 2020, Sides again refused to be seen by a member of the psychology team by remaining in bed with his blanket over his head and eventually stating that he did not want to talk. Sides continued to be monitored by both the psychology and psychiatry team at the facility. (DOCCSUMF ¶¶ 94-99.)

Sides denies refusing to be seen and notes that despite the alleged "Constant Watch," he was able to attempt suicide and engage in SIB. He claims that the telemed sessions were cursory and lasted only a few minutes. He disputes that there were two different members of the team who sought to meet with him. (PRDOCDCSF ¶¶ 94-99; ECF No. 169 Exs. A, B.)

The PRT met to discuss the situation, noting that Sides was not cooperative with treatment and that he refused visits from psychology and psychiatry through August 13, 2020. Psychiatry saw Sides on August 14, 2020, noting that he had "a long standing history of inducing dysfunctional behavior for secondary gains, he functions at a narcissistic level, has poor frustration tolerance, with strong feelings of entitlement, projecting responsibilities for his

behaviors [onto] others, lack of sensitivity for other people['s] needs. Very demanding with unrealistic expectations, and yet when he is offered a proactive psychotherapy he refuses to participate." Sides was discharged from the POC on August 17, 2020. (ECF No. 134-1 at 346-57.)

E.   Post-Incident Care

Sides's next encounter with Kennedy was on August 18, 2020, after his release from the POC to general population. Sides did not participate in this evaluation; instead, he chose to remain in bed. He saw Kennedy again on August 20, 2020, and during this cell-side visit, he mentioned the existence of a lawsuit that he had filed with the hopes of being transferred. Kennedy explained that this was the first time he was hearing anything about a lawsuit and proceeded to conduct a standard cell-side visit. (DOCCSUMF ¶¶ 100-02.)

Sides contends that Kennedy did not offer him out-of-cell visits and that Kennedy already knew about both his grievance and the lawsuit. (PRDOCDCSF ¶¶ 100-02.)

Sides continued to receive regular mental health care from various members of the psychology and psychiatry team. The last time he saw Kennedy during the relevant time period was on August 20, 2020. According to the DOC Defendants, Sides never mentioned any concerns to Kennedy about his privacy being violated during cell side visits. They also assert that Sides's placement in the RHU was never arbitrary; rather, when he incurred a misconduct and was found guilty of the infraction, he would be sanctioned to the appropriate number of days in restricted housing. During the relevant time period, Sides received 18 misconducts. He was found not guilty in 7 of them, and charges against him were dropped. (DOCCSUMF ¶¶ 103-07; ECF No. 134-3.)[4]

---

[4] Sides seems to suggest that all of the misconducts were *Footnote continued on next page…*

Sides denies having regular contact with various members of psychiatry and psychology and states that it is "blatantly obvious" that the statement that he never mentioned privacy concerns to Kennedy is false. He also states that, prior to a hearing examiner conducting a misconduct hearing, the inmate must be interviewed and examined by psychology and a "1-c" form completed, but Kennedy never examined him. (PRDOCDCSF ¶¶ 103-07; Sides Aff. ¶¶ 5, 25-31.)

While Sides continued to be seen by other medical providers over the next several months, he had no further interactions with Kennedy.

**III.    Standard of Review**

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,*

---

either dismissed or remanded because of procedural errors. (PRDOCDCSF ¶ 107.) However, the DOC Defendants have attached a history of his misconducts (ECF No. 134 Ex. 3) that supports their statement and Sides has not challenged this record or submitted evidence to the contrary.

*Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

Although courts must hold pro se pleadings to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), at the summary judgment stage a pro se plaintiff is not exempt from his burden of providing some affirmative evidence, not just mere allegations, to show that there is a genuine dispute for trial. *See, e.g., Barnett v. NJ Transit Corp.*, 573 F. App'x 239, 243 (3d Cir. 2014) (holding that the pro se plaintiff was still "required to designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories . . . sufficient to convince a reasonable fact finder to find all the elements of her prima facie case") (citation and quotation omitted); *Siluk v. Beard*, 395 F. App'x 817, 820 (3d Cir. 2010) ("[T]he right of self-representation does not exempt a party from compliance with relevant rules of procedural law.")

## IV.  <u>Analysis</u>

Two of Sides's claims are asserted under 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). "The first step in any such claim is to identify the

specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). *See also Baker*, 443 U.S. at 140; *Graham v. Connor*, 490 U.S. 386, 394 (1989).

Sides alleges violations of the Eighth Amendment, which prohibits cruel and unusual punishment, which includes deliberate indifference to serious medical needs. He also brings a claim under the Fourteenth Amendment, which "protects a prisoner's right to medical privacy, subject to legitimate penological interests." *Doe v. Delie*, 257 F.3d 309, 311 (3d Cir. 2001). In addition, Sides makes a claim under the MHPA. Each of these claims will be analyzed below.

A.  Eighth Amendment Claims

Sides alleges that, in violation of his Eighth Amendment right to be free from cruel and unusual punishment, he was denied mental health care and that various defendants failed to protect him or were deliberately indifferent to his needs regarding his vulnerability to suicide.

The Supreme Court has held that the Eighth Amendment prevents prison officials from acting with deliberate indifference to prisoners' serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to maintain a claim under the Eighth Amendment, a prisoner must show that: (1) he was subjected to a deprivation that was "objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities"; and (2) a prison official must have acted "deliberate indifference to a prisoner's . . . needs," which occurs only if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).

To satisfy the objective prong of this test, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 373 (3d Cir. 2019) (quoting *Farmer*, 511 U.S. at 834). To satisfy the subjective prong of the Eighth Amendment test, an inmate must show that the prison official "knows that

inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d 210, 229 (3d Cir. 2015) (quoting *Farmer*, 511 U.S. at 847). The inmate "may demonstrate deliberate indifference by showing that the risk of harm was longstanding, pervasive, well documented, or expressly noted by prison officials in the past such that defendants must have known about the risk." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 259 (3d Cir. 2010) (quoting *Farmer*, 511 U.S. at 842-43) (internal quotation marks omitted). In evaluating the subjective prong of the Eighth Amendment test, courts also should consider whether officials "had a legitimate penological purpose" behind their conduct. *Ricks v. Shover*, 891 F.3d 468, 475 (3d Cir. 2018).

The vulnerability to suicide framework "is simply a more specific application of the general rule" because "[i]n essence, a 'particular vulnerability to suicide' is just one type of 'serious medical need.'" *Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017) (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991)).

The Court of Appeals has held that:

> whether a pre-trial detainee or a convicted prisoner, a plaintiff must show: (1) that the individual had a particular vulnerability to suicide, meaning that there was a "strong likelihood, rather than a mere possibility," that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability.

*Id.* at 223-24 (citations omitted). A "strong likelihood" of suicide "must be so obvious that a lay person would easily recognize the necessity for preventative action." *Id.* at 222 (quoting *Colburn*, 946 F.2d at 1025 (citation and quotation marks omitted).

However, in *Palakovic,* the court also clarified that failure to meet a prisoner's serious need for mental healthcare is a separate claim from a vulnerability to suicide claim. *Id.* at 227.

Both claims may coexist. *See, e.g.*, *DeJesus v. Delaware through Delaware Dep't of Corr.*, 833 F. App'x 936, 940 (3d Cir. 2020) ("Because these are two different claims, and the District Court did not examine one of them, namely Plaintiffs' claim of deliberate indifference to a serious medical need, we will remand.")

In ruling on the motions to dismiss, this Court concluded that Sides's Eighth Amendment claim was properly interpreted as a failure to provide adequate mental health treatment, not as a vulnerability to suicide claim. (ECF No. 92 at 17-18.) In his brief in opposition to the motions for summary judgment, Sides mixes the two standards together, but he has not attempted to amend his Complaint to articulate a vulnerability to suicide claim. Therefore, his Eighth Amendment claim will be evaluated as a failure to provide adequate mental health treatment.

1. Serious medical need

"A serious medical need exists where 'failure to treat can be expected to lead to substantial and unnecessary suffering,' and a doctor has diagnosed the condition, or the need for treatment would be obvious to a lay person." *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (citation omitted). A serious mental health need is defined as "one that has been diagnosed by a physician as requiring treatment." *Colburn,* 946 F.2d at 1023.

Exhibit F to the Amended Complaint, a DOC Continuity of Care and Transfer Individual Treatment Plan, states that Sides "was a Stability Code D inmate upon initial reception," lists "an extensive history of inpatient psychiatric admissions while in DOC custody" with numerous placements in MHUs and SNUs and states that, "due to Mr. Sides's profound inpatient psychiatric history, it is highly recommended that he be monitored closely by an appropriate psychiatrist within the community." Moreover, the record reflects that Sides's mental health diagnoses while at SCI Pine Grove included several drug and alcohol disorders, unspecified

depressive disorder, and antisocial personality disorder. He was prescribed psychotropic medications, had therapy sessions, and saw mental health providers on numerous occasions.

Given these facts, the Court concludes that Sides had serious mental health needs that required treatment. Thus, it next becomes necessary to determine whether there are genuine issues of material fact regarding Defendants' alleged deliberate indifference.

### 2. Deliberate Indifference

Under the Eighth Amendment, prison officials are required "to provide basic medical treatment to those whom it has incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle*, 429 U.S. at 105). At the same time, "[i]t is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Rouse*, 182 F.3d at 197; *Estelle,* 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Because "courts give prison medical personnel wide latitude in the diagnosis and treatment of inmates," they should "'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment.'" *Kennedy v. S.C.I. Rockview Employees*, 2010 WL 4853959, at *4 (M.D. Pa. Nov. 22, 2010) (citing *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)). "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990). Thus, negligent or unsuccessful medical treatment do not give rise to a § 1983 cause of action, and an inmate's disagreement with the nature of the medical treatment he receives is insufficient to establish deliberate indifference. *See Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993).

The Third Circuit has "explained that deliberate indifference is 'evident' in certain circumstances, including: (i) the denial of reasonable requests for medical treatment that expose the complainant to undue suffering; (ii) knowledge of the need for medical care and the intentional refusal to provide such care; or (iii) the delay of necessary medical treatment for non-medical reasons." *Mattern v. City of Sea Isle,* 657 F. App'x 134, 140 (3d. Cir. 2016) (citing *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987)). The Third Circuit has also found the existence of "'deliberate indifference' where prison officials . . . continue a course of treatment they know is painful, ineffective, or entails a substantial risk of serious harm." *Williams v. Kort,* 223 F. App'x 95, 100 (3d Cir. 2007) (citing *Rouse,* 182 F.3d at 197 (3d Cir. 1999) and *White v Napoleon,* 897 F.2d 103, 109 (3d Cir. 1990)); *see also Palakovic*, 854 F.3d at 228 ("[T]here are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements."). In *Palakovic*, the fact that the defendants provided some mental health care to the plaintiff did not preclude them from being held liable when they refused to evaluate the efficacy of his medication, spoke to him for only 1 or 2 minutes at a time through a steel door and repeatedly placed him in solitary confinement. *Id.* at 228-29.

a. Claims against Defendants Estock, Bergey, Newman and Yingling

It is uncontroverted that Defendants Estock, Bergey, Newman and Yingling are not medical providers. A non-medical defendant cannot be considered to be "deliberately indifferent simply because [he or she] failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Palakovic*, 854 F.3d at 228. *See also Ascenzi v. Diaz*, 2007 WL 1031516, at *5 (M.D. Pa. Mar. 30, 2007).

Sides argues generally that each of these defendants knew of his situation and had the authority to rectify it but chose not to help him. (Sides Aff. ¶¶ 15, 16.) However, he has not

pointed to any specific actions on their part that could serve as a possible basis for liability. With respect to Superintendent Estock, Sides relies upon an appeal he made to him regarding his grievance and a discussion they had about obtaining a Z-Code. (ECF No. 134-1 at 192, 280.) With respect to Newman and Yingling, Sides merely cites to three records regarding meetings of the PRT that do not reference either defendant. (*Id.* at 178, 282, 578.) And Bergey, who is a CHCA, was contacted about security restraints. (*Id.* at 102, 104, 153.)

This evidence is wholly insufficient to support an Eighth Amendment claim against any of these defendants. *See Hayes v. Gilmore*, 802 F. App'x 84, 87 (3d Cir. 2020) (prisoner simply made conclusory statements regarding the defendants' culpability and claimed that they denied his grievances, but "such actions do not establish personal involvement.") In addition, as these non-medical defendants would have relied on the expertise of medical providers, they cannot be considered to be deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison medical personnel.

Therefore, because there is no evidence of deliberate indifference on the part of Defendants Estock, Bergey, Newman or Yingling, they are entitled to summary judgment in their favor.

b.   Claim against Kennedy

The DOC Defendants contend that Sides has failed to point to any evidence of deliberate indifference on the part of Defendant Kennedy.

As an initial matter, Sides cannot maintain a claim of deliberate indifference against Kennedy based on the failure to classify him as a "D" Code status instead of a "C" Code. There is no evidence of record that Kennedy had any role in determining this classification, nor did he have a role in housing Sides at SCI Pine Grove. Thus, to the extent that Sides alleges that SCI

Pine Grove was an inappropriate placement for him due to the nature of his mental health needs, no such claim can be plausibly asserted against Kennedy.

While it is disputed whether Kennedy offered out-of-cell visits that Sides refused or did not do so, it is uncontroverted that Sides had many mental health interactions with Kennedy. Sides claims that many of these visits were perfunctory and he was unhappy with the nature of his treatment. At the same time, however, he was seen often by Kennedy and was receiving medication, albeit not the medication he believed should have been prescribed.

The record reflects that Kennedy saw Sides regularly between April 2018 and August 2020.[5] During these visits, Kennedy made assessments of Sides's living conditions and general cognitive and mental well-being. Kennedy made notes of what Sides said, whether he was refusing to take his medication and whether Sides denied any current mental health concerns. See ECF No. 134-1 at 6-8, 9-11, 17-19, 33-35, 41-43, 48-50, 51-53, 55-56, 69-70, 91-92, 118-19, 133-34, 135-37, 138-39, 163-64, 165-66, 172, 187-88, 195-97, 208-10, 217-18, 225-26, 234-35, 236-37, 241-42, 243-44, 252-53, 254-55, 280-81, 283-84, 288-89, 371, 375-77. These notes are as detailed as those made by Kennedy when he met with Sides outside his cell. See ECF No. 134-1 at 84-85, 94-98, 189-91261-63, 264-65, 271-72.

Thus, although Sides may disagree with the nature or amount of the treatment he received, the record is undisputed that he was receiving regular treatment and assessments from Kennedy. Thus, he cannot maintain a deliberate indifference claim against Kennedy based upon the care rendered by Kennedy.

Moreover, there are no facts in the record that support any liability on the part of

---

[5] As the record reflects, Sides also received treatment from other medical providers and physicians. While he complains about the care he received, there is no factual support for the claim that Kennedy had any responsibility for the nature, quality or extent of this treatment.

Kennedy based on Sides's allegation that SCI Pine Grove did not have "mental health programming" or that it did not have an on-site psychiatrist. Simply put, there are no facts that could support a finding that Kennedy, who is a Psychological Services Specialist, had the authority or responsibility for these issues. In addition, while Sides complains about the nature of the monitoring of his condition while housed in the POC after he engaged in self-harm behavior, any contention that Kennedy was deliberately indifferent based on the nature or effectiveness of the "Close Watch" or "Constant Watch" requirements is unsustainable given that Kennedy was not responsible for conducting these observations.

For these reasons, the motion for summary judgment filed by the DOC Defendants will be granted with respect to Defendants Estock, Bergey, Newman, Yingling and Kennedy with respect to the Eighth Amendment claims against them.

B.  Fourteenth Amendment Claim

Sides alleges that in violation of his right to privacy, Kennedy improperly revealed his private medical information to other prisoners and staff by speaking to him at his cell door. The DOC Defendants move for summary judgment as to this claim.

In *Doe v. Delie*, 257 F.3d 309, 315-18 (3d Cir. 2001), the Court of Appeals recognized that the Fourteenth Amendment affords a prisoner the right to privacy in his medical information. It also held that "a prisoner does not enjoy a right of privacy in his medical information to the same extent as a free citizen[,]" and that his "constitutional right is subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security." *Id.* at 317. Thus, the Court of Appeals held, a prisoner's right to privacy in his medical information "may be curtailed by" a policy that is "reasonably related to a legitimate penological interests." *Id.* (citing *Turner v. Safley*, 482 U.S.

21

78, 89 (1987)).

In support of their motion with respect to Sides's privacy claim, Defendants cite *Spencer v. Kelchner*, 2008 WL 11508376, at *2 (M.D. Pa. Dec. 11, 2008), *report and recommendation adopted*, 2010 WL 11684309 (M.D. Pa. July 23, 2010). In that case, the court stated that the undisputed record established that "psychological visits of SMU inmates are conducted at the cell door for security purposes, since the medical staff members are not trained in the same manner as CO's are trained to handle inmate threats to their safety. Thus, the purpose of the policy by keeping the SMU inmate in his cell serves a legitimate penological interest since Defendant's undisputed evidence shows that this minimizes the opportunity for the inmate to harm others." *Id.* at *6.

In this case, by contrast, Sides was not identified as a special security risk and the DOC Defendants have not argued that medical providers were restricted to meeting with him at the cell door. On the contrary, they contend that Sides *was* given the option of having out-of-cell visits, but that he frequently refused this option. (Kennedy Decl. ¶¶ 7-9) (ECF No. 134 Ex. 2.) However, Sides disputes this fact, and states that Kennedy would not allow out-of-cell visits, even though there was a secure room in which to conduct them nearby. (Sides Aff. ¶¶ 12, 29.)[6]

The Court cannot resolve these disputed issues of fact. Similarly, although Kennedy has stated in a declaration that Sides "never mentioned any concerns over his privacy being violated during cell side visits" and that he "never mentioned any issues related to other prisoners and/or

---

[6] However, in his responses to Defendants' Concise Statement of Undisputed Material Facts, Sides admits that Kennedy saw him out of the cell on six occasions between October 2018 and April 2020. (DOCCSUMF ¶¶ 35, 40, 70, 87, 88, 90; PRDOCDCSF ¶¶ 35, 40, 70, 87, 88, 90.) Sides refused out of cell visits on another two occasions. (DOCCSUMF ¶ 83; (PRDOCDCSF ¶ 83.) On another occasion, Sides was seen in his cell due to a prison lockdown. (DOCCSUMF ¶ 78; PRDOCDCSF ¶ 78.)

staff knowing anything about his mental health status or being mistreated by them in any way"
(Kennedy Decl. ¶¶ 11-12), Sides has stated that he "strenuously objected" to cell side visits and
was "harassed, ridiculed and made fun of against [his strenuous] objections causing him to have
to decide between receiving mental health treatment [offered only at the cell door] and having
his mental health information disclosed or refuse the cursory cell side visit and be listed as having
'refused' treatment." (Sides Aff. ¶¶ 25-31.) The Court cannot make a credibility determination
regarding this conflicting testimony.

For these reasons, the motion for summary judgment filed by the DOC Defendants with
respect to Sides's Fourteenth Amendment claim will be denied.

C.  MHPA Claim

Sides also alleges a claim against Kennedy under the MHPA, which states, among other
things, that: "All documents concerning persons in treatment shall be kept confidential and,
without the person's written consent, may not be released or their contents disclosed to anyone."
50 P.S. § 7111(a). "The confidentiality provisions of Section 7111 apply to all documents
regarding treatment, not just medical records." *Gormley v. Edgar*, 995 A.2d 1197, 1203 (Pa.
Super. 2010).

First, it is not clear that a private cause of action exists to enforce this provision of the
MHPA. *See Commonwealth v. Gonzalez*, 109 A.3d 711, 728 (Pa. Super. 2015) ("the MHPA
limits judicial use of mental health records to mental health commitment proceedings unless the
patient consents to their use in other judicial proceedings.") More significantly, by its terms,
Section 7111 refers to confidentiality concerning *documents* about persons in treatment. Sides
has not alleged or provided any evidence that Kennedy improperly distributed any documents
about his mental health. Rather, his claim, which is apparently intended to be a parallel to his

Fourteenth Amendment claim, is that Kennedy revealed details about his mental health condition within the prison. As such, there is no basis for concluding that Kennedy's actions violated the provisions of Section 7111.

Therefore, with respect to the MHPA claim, the motion for summary judgment filed by the DOC Defendants will be granted.

**III.**   **Conclusion**

For these reasons, the DOC Defendants' motion will be granted with respect to the Eighth Amendment claims against Defendants Estock, Bergey, Newman and Yingling and Kennedy, granted with respect to the MHPA claim against Kennedy, and denied with respect to the Fourteenth Amendment claim against Kennedy.

An appropriate order follows.

Dated: November 14, 2023                      /s/ Patricia L Dodge
                                              PATRICIA L. DODGE
                                              United States Magistrate Judge


cc:     Anthony Sides
        MR-1194
        SCI PHOENIX
        1200 Mokychic Drive
        Collegeville, PA 19426